UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OKLAHOMA

GERON R. TAYLOR,               )
                              )
            Plaintiff,         )
                              )
v.                            )          Case No. 12-CV-0066-CVE-FHM
                              )
THE CITY OF BIXBY,             )
OKLAHOMA,                      )
                              )
                              )
            Defendant.         )

## OPINION AND ORDER

Before the Court is defendant the City of Bixby's motion for summary judgment. Dkt. # 18.

Also before the Court are plaintiff Geron R. Taylor's motion in limine (Dkt. # 16), defendant's

motion in limine (Dkt. # 17), defendant's motion for continuance (Dkt. # 40), and defendant's

motion to disqualify plaintiff's counsel (Dkt. # 41). Plaintiff filed a petition in Tulsa County District

Court (Dkt. # 2-1), generally alleging constitutional violations pursuant to 42 U.S.C. §§ 1981 and

1983, state law tort claims, and violations of the Oklahoma Constitution, and defendant removed the

case to federal court (Dkt. # 2). Defendant argues, in its motion for summary judgment, that there

is no genuine dispute of material fact and that defendant is entitled to judgment as a matter of law

on all of plaintiff's claims.

## I.

The facts as to which there is no dispute are as follows: In the early morning hours of

September 8, 2011, as plaintiff was driving to work, he was stopped by a City of Bixby police

officer for speeding. Dkt. # 18-2, at 39, 46; Dkt. # 36-13, at 5. Plaintiff saw the officer's police car,

and stated that he, therefore, could not have been speeding because "anybody with common sense

would have slowed down." Dkt. # 18-2, at 40-41, 51.  The officer showed plaintiff the radar

reading, which indicated that plaintiff was traveling 49 miles-per-hour in a 40 miles-per-hour zone.

Id. at 41.  Plaintiff claims that the officer stopped him because he is black, and that is just "how it

goes in Bixby." Id. at 49.  The officer determined that plaintiff did not have a driver's license, and

plaintiff acknowledged that he had never had one. Id. at 16.  Plaintiff was arrested and taken to the

lock-up facility in Bixby, Oklahoma.  Dkt. # 36-1, at 14.   Plaintiff stated that both the arresting

officer and officer who booked him into the lock-up facility treated him appropriately. Dkt. # 18-2,

at 56.  Plaintiff's mother posted his bond within a few hours, and plaintiff was released.  Id. at 57.


Thereafter, plaintiff appeared, without counsel, before a municipal judge of the City of

Bixby. Id. at 59.  While a group of defendants was seated in the courtroom, and prior to calling any

defendant forward, the municipal judge read from a form script, which included the statement that

a defendant who did not have an attorney could let the court know, and the court would postpone

hearing that person's case.  Dkt. # 36-3, at 5; Dkt. # 36-4, at 8; Dkt. # 36-17.  However, plaintiff

claims that he never heard anyone tell him that he could receive the assistance of an attorney, and

that he did not receive the pamphlet that the Bixby municipal court sometimes provided (Dkt. # 36-

4, at 10; Dkt. # 36-13, at 5; Dkt. # 36-17, at 1), which let defendants know that they could continue

their case until they were appointed counsel.  Dkt. # 18-2, at 62.  The court bailiff remembers the

municipal judge giving her form script speech to the group, but does not remember the municipal

judge specifically advising plaintiff of his rights. Dkt. # 36-3, at 8.  Plaintiff was called forward, and

plaintiff admitted that he was guilty of driving without a license.  Dkt. # 18-2, at 64-65.  The

municipal judge questioned plaintiff about his multiple citations, especially his previous citations

2

for driving without a license.[1]  Id. at 66; Dkt. # 36-3, at 6.  Plaintiff stated that he had to drive to get

to work, but acknowledged that he knew it was wrong to drive without a license.   Dkt. # 18-2, at

66.  The municipal judge found plaintiff guilty of both speeding and driving without a license, fined

him in the amount of $703, and sentenced him to ten days in jail.  Dkt. #18-4-3.  Plaintiff was

surprised that he was sentenced to a term of imprisonment, because three of his previous citations

for driving without a license resulted in a fine only.  Dkt. # 18-2, at 30; Dkt. # 36-3, at 6-7.  The

bailiff placed handcuffs on plaintiff, and told plaintiff just to "do your 10 days." Dkt. # 18-2, at 67.

The bailiff also told plaintiff that there would be no fine for his offense as long as he served his ten

days.  Id. at 70; Dkt. # 36-3, at 6-7.  At some point during plaintiff's incarceration, he was asked to

sign a document acknowledging that he would owe a fine, which plaintiff refused to sign.  Dkt. #

18-2, at 69-70.

    Plaintiff was incarcerated from approximately October 4-14, 2011.   Dkt. # 36-1, at 7.

During his ten-day incarceration, plaintiff's use of the telephone was restricted to a single call to his

mother.  Id. at 22-23; Dkt. # 36-3, at 11.  Plaintiff was upset that he was incarcerated, and he asked

his mother not to visit him.  Dkt. # 18-2, at 26-27.  While in his cell, plaintiff heard someone utter

the "N word." Dkt. # 18-2, at 79-81; Dkt. # 36-13, at 3.  Plaintiff could not see the individual who

said the "N word," but he heard someone "from the front" say it.  Dkt. # 18-2, at 81; Dkt. # 36-13,

at 3.  An officer turned off the water while plaintiff was in the shower and "had soap everywhere."

Dkt. # 36-1, at 22.  The officer told plaintiff that there was a time constraint on showers, though

---

[1]    The court clerk provided the municipal judge with a docket sheet that stated plaintiff had
"nine no DL or DUS violations." Dkt. # 36-4, at 6.  The court clerk had requested plaintiff's
driving record from the dispatchers for the City of Bixby, and had provided the information
from the driving record to the municipal judge by noting the number of previous citations
on the docket sheet.  Id.

plaintiff stated that he had only been in the shower for approximately four minutes. <u>Id.</u> After turning off the water, the officer stated "see there, boy, I told you I can be an asshole, too." <u>Id.</u>

One night, plaintiff had to "get under the bed to stay warm" because his vent was blowing cold air, but the officers gave him a "cover."[2] Dkt. # 36-13, at 4. When plaintiff attempted to obtain an officer's attention for more toilet paper, and he could not, plaintiff stated that he would just use his hand. Dkt. # 18-2, at 96. Plaintiff stated that officers then "rushed in with [ ] guns" and handcuffed plaintiff in the holding cell. <u>Id.</u> at 96. Plaintiff was handcuffed "real tight" so that it left "a heavy print" on his wrist. <u>Id.</u> at 93, 107-108; Dkt. # 36-20. On another occasion, plaintiff was told that "[he] can use [his] hand to wipe" himself. Dkt. # 18-2, at 92. Plaintiff had "no toilet paper" or "a little bit of tissue." Dkt. # 36-13, at 3-4. Plaintiff also stated that defendant stopped providing him soap, and that he "had to eat with [his] hands" and then "wipe [his] butt with [his] hands." <u>Id.</u> at 4. Plaintiff then stated the only time that he had soap was on one Thursday.[3] <u>Id.</u>

Officers also unholstered a gun in plaintiff's presence on other occasions. Dkt. # 18-2, at 99-101, 102-105. Plaintiff spilled milk outside of his cell, and the officer unholstered his gun when the officer opened the plaintiff's cell door to allow plaintiff to clean up the spill. <u>Id.</u> at 100-01; Dkt. # 36-13, at 3. Plaintiff stated that the officer did not point the gun at him, but the officer had the gun out of the holster. Dkt. # 18-2, at 101. The officer stated "Boy, you are going to pick that up," and

---

[2]     Plaintiff stated that the first week of his incarceration he did not have any problems. Dkt. # 36-1, at 25. Plaintiff stated that the second week, beginning October 10, 2011, is when the problems began. <u>Id.</u> Plaintiff also stated, however, that he "might have had a few dates mixed up" because it is difficult to remember. <u>Id.</u> at 24. Therefore, it is unclear when plaintiff refers to specific days of the week whether he is referring to the first or second week of his incarceration.

[3]     Plaintiff does not specify whether he is referencing the first or second Thursday of his incarceration.

"I am going to make sure you get it." Dkt. # 36-13, at 3.  On another occasion, a female officer and approximately three other officers entered plaintiff's cell, and the female officer had her gun unholstered and pointed at plaintiff. Dkt. # 18-2, at 103-05.  A male officer also had his hand on his gun, but his gun remained in his holster. Id.  The female officer stated "Make a move that black skin will make you white, Boy."  Dkt. # 36-13, at 5.  At a later point in time, plaintiff stated that he instead believed the female officer said "go ahead and try anything" and "I want to use this, I want to use this."  Dkt. # 36-1, at 27.  Plaintiff's lunch was thrown away before he could eat it when he did not retrieve it fast enough, and a second meal was taken away from him as well.[4]  Dkt. # 18-2, at 87-92; Dkt. # 36-13, at 3.  On one of these occasions, plaintiff was without food for seventeen and a half hours. Dkt. # 36, at 5.

During his incarceration, plaintiff pulled the bed away from the wall.  Dkt. # 36-6, at 6. Plaintiff also stuffed toilet paper into the vent.  Dkt. # 36-5, at 6-10; Dkt. # 36-6, at 7.  Plaintiff then wrote on the jail cell door with toothpaste, which was cleaned by Corporal Jim White.  Dkt. # 36-6, at 7.  When Corporal White and another officer entered plaintiff's cell to clean the toothpaste from the door, at least one officer was carrying a taser, which was not in its holster. Id. at 12.  After plaintiff wrote on the cell door with toothpaste, Corporal White cited plaintiff for destroying, injuring, or molesting public property (Dkt. # 18-3-2; Dkt. # 36-6, at 11), and plaintiff was subsequently convicted. Dkt. # 18-5.  Plaintiff appealed his conviction, and the appeal is pending. Dkt. # 36-10, at 1.  After his release, plaintiff was unable to return to work because he had been

---

[4]   Plaintiff had trouble remembering whether the first meal that was thrown away was the morning, mid-day, or evening meal.  Dkt. # 36-1, at 22-24.  However, plaintiff stated that the next meal that was thrown away by an officer was the mid-day meal of the following day.  Id. at 24.

terminated, which he believes was caused by his restricted use of the telephone because he was unable to call his employer.  Dkt. # 18-2, at 72-73; Dkt. # 36-1, at 5.  However, plaintiff's mother called plaintiff's employer while he was incarcerated to notify his employer of plaintiff's incarceration.  Dkt. # 36-1, at 5; Dkt. # 36-3, at 11.

## II.

Summary judgment pursuant to Fed. R. Civ. P. 56 is appropriate where there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986); Kendall v. Watkins, 998 F.2d 848, 850 (10th Cir. 1993).  The plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. Celotex, 477 U.S. at 317.  "Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'"  Id. at 327.

"When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. . . .  Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'"  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986) (citations omitted).  "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the [trier of fact] could reasonably find for the plaintiff."  Anderson, 477 U.S. at 252.  In essence, the inquiry for the Court

6

is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Id. at 250.  In its review, the Court construes the record in the light most favorable to the party opposing summary judgment. Garratt v. Walker, 164 F.3d 1249, 1251 (10th Cir. 1998).

### III.

Plaintiff's complaint generally alleges six claims, and requests monetary relief in the amount of $1,000,000, plus interest, costs, and attorney fees.  Dkt. # 2-1, at 3.  First, plaintiff argues that, pursuant to 42 U.S.C. § 1983, his Sixth Amendment rights to have an attorney present at his trial and right to be present at all stages of the proceeding were violated.  Id. at 2-3.  Second, plaintiff asserts that, pursuant to 42 U.S.C. §§ 1981 and 1983, his Eighth Amendment rights were violated because of the treatment he received while incarcerated.  Id. at 3.  Third, plaintiff argues that his Fourteenth Amendment rights were violated because the arresting officer stopped his vehicle based solely on his race.  Id. at 1.   Fourth, plaintiff asserts that the charge for destroying, injuring, or molesting public property is a retaliatory charge that is based on his race.  Id. at 2.  Fifth, plaintiff argues that defendant violated the Oklahoma constitution because plaintiff was not granted a jury trial, did not have an attorney for the speeding and driving without a driver's license convictions, was fined beyond the amount provided for by law, and endured cruel and unusual punishment.  Id. at 3.  Sixth, plaintiff asserts state law tort claims of outrage and assault and battery.  Id.  Plaintiff's petition prays for monetary damages; however, in response to defendant's motion for summary judgment, plaintiff also asserts that, should the Court find that the municipal judge is immune from suit, injunctive relief is appropriate.  Dkt. # 36, at 18.  Defendant argues that there is no genuine dispute of any material fact and that all of plaintiff's claims fail as a matter of law.

7

**IV.**

Many of plaintiff's claims are brought pursuant to 42 U.S.C. §§ 1981 and 1983.  Therefore, the Court will first address the relevant standard for a claim brought under either § 1981 or § 1983.  In Bolden v. City of Topeka, 441 F.3d 1129, 1134-37 (10th Cir. 2006), the Tenth Circuit recognized the United States Supreme Court's decision in Jett v. Dallas Independent School District, 491 U.S. 701 (1989), wherein the Court found that § 1983 provides the exclusive damages remedy for the rights guaranteed by § 1981 for claims against state actors, such as municipalities.  Under Jett, therefore, § 1981 claims are restricted by the same doctrines limiting § 1983 claims.  Bolden, 441 F.3d at 1135.

Section 1983 provides, in part, that "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured."  To state a claim under § 1983, and by extension under § 1981, a plaintiff must allege two essential elements: (1) that a right secured by the Constitution or laws of the United States was violated, and (2) "that the alleged violation was committed by a person acting under color of state law."  West v. Atkins, 487 U.S. 42, 48 (1988) (citations omitted).  "Section 1983 will not support a claim based on a *respondeat superior* theory of liability."  Polk Cnty. v. Dodson, 454 U.S. 312, 325 (1981) (citations omitted).  In the case of a municipal entity, the "under color of state law" element requires that the constitutional deprivation occurred pursuant to official policy or custom.  Monell v. Dep't of Soc. Servs. of City of New York, 436 U.S. 658, 694 (1978).  A municipal entity may be held liable for an act it has officially sanctioned, or for the actions of an official with final policymaking authority.

8

Pembaur v. City of Cincinnati, 475 U.S. 469, 480, 482-83 (1986); see also City of St. Louis v. Praprotnik, 485 U.S. 112, 127-28 (1988).  A plaintiff "must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights." Barney v. Pulsipher, 143 F.3d 1299, 1307 (10th Cir.1998) (quoting Bd. of Cnty. Comm'rs of Bryan Cnty., Okla. v. Brown, 520 U.S. 397, 404 (1997)).

In order to show that the alleged constitutional deprivation occurred pursuant to an official policy, plaintiff must show that there was a "statement, ordinance, regulation, or decision officially adopted and promulgated by [a municipality's] officers." Lankford v. City of Hobart, 73 F.3d 283, 286 (10th Cir. 1996) (alterations in Lankford) (internal citations omitted).  Even in the absence of an official policy, "a plaintiff may be able to prove the existence of a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a 'custom or usage' with the force of law." Praprotnik, 485 U.S. at 127 (internal quotations omitted).  See also Jett, 491 U.S. at 736 (governmental entities may be liable for a "longstanding practice or custom which constitutes the 'standard operating procedure' of the local government entity"). In attempting to prove the existence of such a "continuing, persistent and widespread" custom, "plaintiffs most commonly offer evidence suggesting that similarly situated individuals were mistreated by the municipality in a similar way." Carney v. City & Cnty. of Denver, 534 F.3d 1269, 1274 (10th Cir. 2008).  Generally, "allegations of an isolated incident are not sufficient to show the existence of a custom or policy." Reed v. Ottawa Cnty. Sheriff's Dep't., 2010 WL 5209260, *2 (N.D. Okla. Dec. 16, 2010) (citing Fraire v. City of Arlington, 957 F.2d 1268, 1278 (5th Cir. 1992)).

The determination of whether an individual has final policymaking authority is a question of law.  Milligan-Hitt v. Bd. of Trustees of Sheridan Cnty. Sch. Dist. No. 2, 523 F.3d 1219, 1224 (10th Cir. 2008) ("The judge, not the jury, should determine who exercises final policymaking authority in a municipality.").  The Tenth Circuit has stated that "policymaking authority is discovered by looking to the presence of legal authority rather than examining the facts of its exercise in a particular case." Id. at 1229.  In determining whether an official is a final policymaker within his area of authority, courts look primarily to two factors: "first, whether his 'discretionary decisions are constrained by general policies enacted by others,' and second, whether those 'decisions are reviewable by others.'" Id. at 1228 (quoting Dill v. City of Edmond, 155 F.3d 1193, 1211 (10th Cir. 1998)).  With these standards in mind, the Court will address plaintiff's claims against defendant.

## A.

Plaintiff's first claim is that his Sixth Amendment rights to an attorney and to be present for all stages of the proceeding were violated.   Pursuant to Heck v. Humphrey, 512 U.S. 477, 487 (1994), "a state prisoner's claim for damages is not cognizable under 42 U.S.C. § 1983 if 'a judgment in favor of the plaintiff would necessarily imply the invalidity of his conviction or sentence,' unless the prisoner can demonstrate that the conviction or sentence has previously been invalidated." Edwards v. Balisok, 520 U.S. 641, 643 (1997) (quoting Heck, 512 U.S. at 487). However, Justice Souter, concurring in Heck, noted that Heck should not "cast doubt on the ability of an individual unaffected by the habeas statute to take advantage of the broad reach of § 1983." Heck, 512 U.S. at 503 (Souter, J., concurring).  Clarifying his concurrence, Justice Souter noted, in Spencer v. Kemna, 523 U.S. 1, 20-21 (1998) (Souter, J., concurring), that "[t]he better view, then,

10

is that a former prisoner, no longer 'in custody,' may bring a § 1983 action establishing the unconstitutionality of a conviction or confinement without being bound to satisfy a favorable-termination requirement that it would be impossible as a matter of law for him to satisfy." In Cohen v. Longshore, 621 F.3d 1311, 1315 (10th Cir. 2010), an inmate "sought to invalidate his imprisonment through a 28 U.S.C. § 2254 petition but was prevented by his transfer out of Immigrations and Customs Enforcement custody, which mooted his habeas claim." The Tenth Circuit acknowledged that the "circuits have split on the question of whether the *Heck* favorable-termination requirement applies when the plaintiff lacks an available habeas remedy," but found "that a petitioner who has no available remedy in habeas, through no lack of diligence on his part, is not barred by *Heck* from pursuing a § 1983 claim." Id. at 1317. The Tenth Circuit noted that "[i]f a petitioner is unable to obtain habeas relief-at least where this inability is not due to the petitioner's own lack of diligence-it would be unjust to place his claim for relief beyond the scope of § 1983 where 'exactly the same claim could be redressed if brought by a former prisoner who had succeeded in cutting his custody short through habeas.'" Id. (quoting Spencer, 523 U.S. at 21 (Souter, J., concurring)).

Following Cohen, at least one district court has found that a claim was not barred by Heck where the plaintiff was "diligent in pursuing his claims but [ ] unable to pursue habeas relief." Hill v. City of Okla. City, 2011 WL 1099284, *4 (W.D. Okla. Feb. 25, 2011). In Hill, plaintiff was arrested for failure to appear regarding various municipal citations. Id. at *1. Plaintiff filed a petition for writ of habeas corpus, but, recognizing his petition was rendered moot by his release, plaintiff voluntarily dismissed his habeas action. Id. The district court found that, because plaintiff

11

was diligent in pursuing his claims through filing a habeas petition during his incarceration, his claims were not barred by Heck.

In finding that a petitioner "who has no available remedy in habeas, through no lack of diligence on his part, is not barred by *Heck*," the Tenth Circuit adopted the reasoning of the Second, Fourth, Sixth, Seventh, and Eleventh Circuit Courts. Cohen, 621 F.3d at 1316-17. The Tenth Circuit has not addressed the question presented here - - whether plaintiff is barred by Heck where has no available habeas remedy but he has an avenue of relief available in state court. The Eleventh Circuit, in Domotor v. Wennett, 356 Fed. Appx. 316 (11th Cir. 2009), aff'g 630 F. Supp. 2d 1368, 1380 (S.D. Fla. 2009), answered the question in the affirmative and adopted the district court finding that "even though a habeas corpus action is currently unavailable to Plaintiff here, [she] was not without an avenue to seek relief from [her] conviction," and her claims should therefore be dismissed. Domotor, 630 F. Supp. 2d at 1380; cf. Harden v. Pataki, 320 F.3d 1289, 1298-99 (11th Cir. 2003).

It is worth noting that the Supreme Court, in Heck, addressed this very issue and noted that the cause of action did not accrue until "state challenges to the conviction or sentence were [ ] exhausted." Heck, 512 U.S. at 489. Instead, a prisoner simply had "no cause of action under § 1983 unless and until the conviction or sentence is reversed, expunged, invalidated, or impugned by the grant of a writ of habeas corpus." Id.

A judgment in favor of plaintiff on his claims challenging the constitutionality of his trial, including the fact that he did not have an attorney and was not present at all stages of the proceeding, would "necessarily imply the invalidity of his conviction or sentence." Heck, 512 U.S. at 487. If the Court were to find merit to plaintiff's claims based on defendant's failure to provide an attorney

or failure to allow plaintiff's presence at all stages of the proceedings, that finding would necessarily imply the invalidity of the driving without a driver's license and speeding convictions. Plaintiff has not shown that either his driving without a driver's license or speeding convictions have been overturned or otherwise invalidated. Therefore, if the favorable-termination requirement applies to plaintiff, plaintiff's § 1983 claims have not have accrued, and plaintiff's claims should be dismissed without prejudice.

Pursuant to Cohen, plaintiff's claims are subject to the favorable-termination requirement if plaintiff has not been diligent in pursuing his claims. Plaintiff did not appeal or otherwise challenge his convictions for speeding and driving without a driver's license. See Dkt. # 36-10. The Rules for the Oklahoma Court of Criminal Appeals provide that

> [i]n all cases, to appeal from any conviction on a plea of guilty or nolo contendere, the defendant must have filed in the trial court clerk's office an application to withdraw the plea within ten (10) days from the date of the pronouncement of the Judgment and Sentence, setting forth in detail the grounds for the withdrawal of the plea and requesting an evidentiary hearing in the trial court.

Okla. Crim. App. R. 4.2(A). The procedures enumerated in Rule 4 apply to both felony and misdemeanor guilty pleas, including "pleas entered to motor vehicle traffic violations, fish and game violations and misdemeanors which cannot serve a predicate crime for a felony." Okla. Crim. App. R. 4.1. The Oklahoma Uniform Post-Conviction Procedure Act, Okla. Stat. tit. 22, § 1080 (1970), provides that

> any person who has been convicted of, or sentenced for, a crime and who claims: (a) that the conviction or the sentence was in violation of the Constitution of the United States or the Constitution or laws of this state; . . . [or] (c) that the sentence exceeds the maximum authorized by law . . . may institute a proceeding under this act in the court in which the judgment and sentence on conviction was imposed to secure the appropriate relief . . . .

Further, "[t]he procedures established for criminal proceedings in Oklahoma provide for an appeal out of time when a prisoner could not appeal or his appeal was not timely filed 'through no fault of his own.'" Banks v. State, 953 P.2d 344, 346 (Okla. Crim. App. 1998). "If petitioner seeks an appeal out of time, the proper procedure is to file an Application for Post-Conviction Relief requesting an appeal out of time. The Application must be filed in the trial court where the judgment and sentence on conviction or the final order denying relief was imposed." Okla. Crim. App. R. 2.1(E)(1). "When an appeal out of time is granted by [the Oklahoma Court of Criminal Appeals] for a certiorari appeal arising from a plea of guilty or *nolo contendere*, an Application to Withdraw the Plea must be filed with the clerk of the trial court within ten (10) days from the date of this Court's order with a request for evidentiary hearing pursuant to Rule 4.2." Okla. Crim. App. R. 2.1(E)(4). The trial court shall then hold an evidentiary hearing, and if the trial court fails to do so within thirty days, the petitioner may seek relief from the Oklahoma Court of Criminal Appeals. Okla. Crim. App. R. 4.2(B). If the petitioner's application to withdraw his or her plea is denied, the petitioner may file a notice of intent to appeal with the trial court, which is then responsible for seeking a petition for certiorari before the Oklahoma Court of Criminal Appeals. Okla. Crim. App. R. 4.2(D).

Acknowledging that the Tenth Circuit found in Cohen that a plaintiff, who could not avail himself of habeas relief, but had been diligent pursuing his claim, was subject to the favorable-termination requirement, this Court finds that plaintiff has not afforded the state of Oklahoma an opportunity to cure the alleged constitutional violations and was not diligent in pursuing his claims. Plaintiff clearly had available state remedies through which he could have, potentially, "reversed, expunged, [or] invalidated" his conviction. Heck, 531 U.S. at 489. Although plaintiff could not

14

have pursued a habeas remedy because of the short length of his imprisonment, he was not barred from seeking relief in state court.  Unlike the plaintiff in Hill, plaintiff has not been diligent because he failed to file an appeal or otherwise pursue state court remedies.

If plaintiff files an application for post-conviction relief with the Oklahoma Court of Criminal Appeals, and the court denies plaintiff a remedy, plaintiff could bring his § 1983 claims at that time.  See Waters v. City of Lawton, 2006 WL 2773233, *3 (W.D. Okla. Sept. 25, 2006) ("The Tenth Circuit has said that for § 1983 claims necessarily challenging the validity of a conviction or sentence, *Heck* delays the rise of the cause of action until the conviction or sentence has been invalidated." (citing Beck v. City of Muskogee Police Dep't., 195 F.3d 553, 557 (10th Cir. 1999))).  Thus, the Court finds that plaintiff's Sixth Amendment claims should be dismissed pursuant to the Heck analysis.

"[C]laims dismissed on *Heck v. Humphrey* grounds should be dismissed without prejudice." Bryner v. Utah, 429 Fed. Appx. 739, 744-45 (10th Cir. 2011) (citing Fottler v. United States, 73 F.3d 1064, 1065 (10th Cir. 1996)) (unpublished);[5] see also Schafer v. Moore, 46 F.3d 43, 45 (8th Cir. 1995); Trimble v. City of Santa Rosa, 49 F.3d 583, 585 (9th Cir. 1995).  Therefore, all of plaintiff's claims for violations of the Sixth Amendment should be dismissed without prejudice.

## B.

Plaintiff's second § 1983 claim is that his Eighth Amendment rights were violated by his treatment while incarcerated.  Plaintiff alleges that defendant failed to adequately train, supervise, or discipline its officers to prevent constitutional violations; that defendant failed to establish

---

[5]     Unpublished decisions are not precedential, but may be cited for their persuasive value.  See Fed. R. App. P. 32.1; 10th Cir. R. 32.1.

policies to prevent constitutional violations; that defendant ratified the actions of its officers; and that defendant has established a de facto pattern, practice, and custom of violating the constitutional rights of the people.  As a municipality, defendant will not be held liable under § 1983 solely because its employees inflicted injury. Monell, 436 U.S. at 694.  Rather, to establish municipal liability, a plaintiff must show both the existence of a municipal policy or custom and a "direct causal link" between the policy or custom and the injury alleged.  City of Canton v. Harris, 489 U.S. 378, 385 (1989).  In addition, a municipality may not be held liable for monetary damages where there was no underlying constitutional violation by any of its officers.  City of Los Angeles v. Heller, 475 U.S. 796, 799 (1986).  Therefore, plaintiff must first show that there was an underlying constitutional violation.

Plaintiff claims that the conditions of his confinement - - specifically, restricted access to toilet paper, officers unholstering their guns in his presence, missed meals, and use of racial epithets or slurs - - violated his Eighth Amendment right to be free from cruel and unusual punishment. "Conditions of confinement fall within the Eighth Amendment because they are part of the penalty that criminal offenders, such as plaintiff, pay for their offenses." Penrod v. Zavaras, 94 F.3d 1399, 1405 (10th Cir. 1996) (citing Whitley v. Albers, 475 U.S. 312, 318-19 (1986)).  While prison officials have "broad administrative and discretionary authority to manage and control prisons," Penrod, 94 F.3d at 1405, they must provide humane conditions based on "contemporary standards of decency." Estelle v. Gamble, 429 U.S. 97, 103 (1976).  Prison officials are required to provide humane conditions of confinement by ensuring inmates receive the basic necessities of "adequate food, clothing, shelter, and medical care." Farmer v. Brennan, 511 U.S. 825, 832 (1994); Barney, 143 F.3d at 1310.  However, "only those deprivations denying the minimal civilized measure of

16

life's necessities . . . are sufficiently grave to form the basis of an Eighth Amendment violation." Wilson v. Seiter, 501 U.S. 294, 298 (1991) (internal quotation marks omitted).

In order to hold prison officials liable for violating plaintiff's right to humane conditions of confinement under the Eighth Amendment, two requirements must be met. First, the deprivation alleged must be "sufficiently serious." Farmer, 511 U.S. at 834 (citations omitted). "[T]he inmate must show that he [was] incarcerated under conditions posing a substantial risk of serious harm." Id. Second, the officials must have a "sufficiently culpable state of mind," meaning that the officials must exhibit "deliberate indifference" to a substantial risk of serious harm to plaintiff. Id. The Court addresses these two requirements below.

## 1.

The first requirement, that the conditions complained of must be "sufficiently serious" to implicate constitutional rights, is an objective inquiry. To satisfy this prong, plaintiff "must show that conditions were more than uncomfortable," DeSpain v. Uphoff, 264 F.3d 965, 973 (10th Cir. 2001), and rose to the level of "conditions posing a substantial risk of serious harm" to plaintiff. Farmer, 511 U.S. at 834. The Eighth Amendment "does not mandate comfortable prisons;" the conditions imposed may be "restrictive and even harsh." Rhodes v. Chapman, 452 U.S. 337, 347 (1981). The Court's analysis should not be based on "[its] idea of how best to operate a detention facility." Id. at 351. It should reflect a "balance between judicial respect for the exigencies of running a prison and the 'broad and idealistic concepts of dignity, civilized standards, humanity and decency' embodied in the Eighth Amendment." DeSpain, 264 F.3d at 973 (quoting Estelle, 429 U.S. at 102) (internal citations omitted).

In Wilson, the Supreme Court noted that  conditions of confinement should be examined as a whole because deprivations "in combination" may constitute a constitutional violation.  501 U.S. at 304.  It noted that, for example, "a low cell temperature at night combined with a failure to issue blankets" could have a "mutually enforcing effect that produces the deprivation of a single, identifiable human need, such as . . . warmth." Id.  In examining the conditions of confinement, the "'circumstances, nature and duration' of the challenged conditions must be carefully considered." DeSpain, 264 F. 3d at 974 (quoting Johnson v. Lewis, 217 F.3d 726, 731 (9th Cir. 2000)); see also Craig v. Eberly, 164 F.3d 490, 495 (10th Cir. 1998) (inquiry into whether alleged deprivations are sufficiently serious "turns not only on the severity of the alleged deprivations, but also on their duration.").

Plaintiff alleges that he was denied sufficient amounts of toilet paper.  "[E]xposure to human waste carries particular weight in the conditions calculus." DeSpain, 264 F.3d at 974; McBride v. Deer, 240 F.3d 1287, 1292 (10th Cir. 2001) (finding "sufficiently serious" conditions where inmate was detained in feces-covered cell for three days); Fruit v. Norris, 905 F.2d 1147, 1151 (8th Cir. 1990) ("courts have been especially cautious about condoning conditions that include an inmate's proximity to human waste"); Michaud v. Sheriff of Essex County, 390 N.E.2d 523 (Mass. 1983) (compiling cases showing "an intolerance for confinement which requires persons to live in close proximity to their own human waste and that of others."). "Exposure to human waste, like few other conditions of confinement, evokes both the health concerns emphasized in *Farmer* and the more general standards of dignity embodied in the Eighth Amendment." DeSpain, 264 F.3d at 974. Despite the Tenth Circuit and this Court's concerns regarding exposure to human waste, upon examining the circumstances of this case, the Court finds that plaintiff's Eighth Amendment rights

18

were not violated.  Plaintiff states that toilet paper was severely restricted and that he had to wipe himself with his own hand. Dkt. # 18-2, at 92; Dkt. # 36-13, at 3-4.  Those allegations are far afield from the types of cases where exposure to human waste constitutes an Eighth Amendment violation. See, e.g., DeSpain, 264 F.3d at 975 (plaintiff met the objective prong of Farmer test where plaintiff was exposed for thirty-six hours to stench of sitting urine in his toilet and urine and feces in water near his cell and where officers rolled food cart through the urine-mixed water); Johnson v. Pelker, 891 F.2d 136, 139 (7th Cir. 1989) (three days in cell with feces smeared on walls was not within "civilized standards, humanity, and decency").  Although the Tenth Circuit has noted that "denial of toilet paper" was a consideration in determining whether a plaintiff has established an Eighth Amendment violation, the circuit court also noted that the withholding of toilet paper was in combination with "lack of heat . . . lack of clothing and bedding, the deprivation of exercise for an extensive period of time, the lack of hot water, . . . the removal of his prescription eyeglasses, the lack of adequate ventilation and the denial of writing utensils." Mitchell v. Maynard, 80 F.3d 1433, 1443 (10th Cir. 1996).  In Mitchell, the circuit court found that, because the deprivations, in combination, could have lasted for as long as five and one half months, the district court erred in granting defendants' motion for judgment as a matter of law. Id. at 1443.  Plaintiff has not raised such a claim.  He does not even allege that he was deprived of toilet paper for his entire ten day incarceration, and there is evidence in the summary judgment record that toilet paper had been stuffed into a vent. Dkt. # 36-5, at 6-10; Dkt. # 36-6, at 7.  Providing smaller amounts of toilet paper, standing alone, does not rise to the level of a constitutional violation.

Although plaintiff complains about the cold temperature in his cell, he acknowledges that officers brought him a "cover," and that the cold condition lasted only one night. Dkt. # 36-13, at 4.

Plaintiff's third complaint is that he was denied food. Plaintiff alleges that, over a ten-day period, he missed one meal on two separate days. Dkt. # 18-2, at 89-92. Thus, plaintiff always received at least two meals per day. "The deprivation of food constitutes cruel and unusual punishment only if it denies a prisoner the 'minimal civilized measure of life's necessities.'" Talib v. Gilley, 138 F.3d 211, 214 n.3 (5th Cir. 1998) (quoting Wilson, 501 U.S. at 298); see also Berry v. Brady, 192 F.3d 504, 507-08 (5th Cir. 1999). "Even on a regular, permanent basis, two meals a day may be adequate." Berry, 192 F.3d at 507-08 (citing Green v. Ferrell, 801 F.2d 765, 770-71 (5th Cir. 1986)). The Court finds that plaintiff's complaint that he missed two meals over a ten-day period is not "sufficiently serious" so as to implicate constitutional rights.

Plaintiff's fourth complaint is that he was placed in handcuffs that were so tight that the handcuffs left marks on plaintiff's wrist. His fifth complaint is that the officers pointed guns or otherwise threatened him. Plaintiff does not identify whether he is making a separate claim that excessive force was used in violation of the Eighth Amendment, but the Court will analyze plaintiff's claims as both a condition of his confinement and as an excessive force claim. See infra Section IV.B.3. "There are few cases in which the State's interest in combating the danger posed by a person to himself and others is greater than in a prison environment, which, 'by definition,' is made up of persons with 'a demonstrated proclivity for antisocial criminal, and often violent, conduct.'" Washington v. Harper, 494 U.S. 210, 225 (1990) (quoting Hudson v. Palmer, 468 U.S. 517, 526 (1984)) (remaining citations omitted) (discussing Due Process clause violation within

prison context).  "[C]ourts cannot assume that . . . prison officials are insensitive to the requirements of the Constitution or to the perplexing sociological problems of how best to achieve the goals of the penal function in the criminal justice system."  Rhodes, 452 U.S. at 352.  And, "[i]n assessing claims that conditions of confinement are cruel and unusual, courts must bear in mind that their inquiries 'spring from constitutional requirements and that judicial answers to them must reflect that fact rather than a court's idea of how best to operate a detention facility.'"  Id. (citing Bell v. Wolfish, 441 U.S. 520, 539 (1979)).  Neither the officers' decision to have guns in hand, nor to handcuff plaintiff while he was in the holding cell, is a condition that poses "a substantial risk" of harm to plaintiff.  Farmer, 511 U.S. at 84.  Plaintiff has failed to show that conditions of his confinement were "more than uncomfortable."  DeSpain, 264 F.3d at 973.

Plaintiff's sixth claim is that the use of racial slurs or epithets was a constitutional violation.  Plaintiff states that he was called the "N word" on one occasion, and that he could not identify who made the statement.  Dkt. # 18-2, at 79-82.  Plaintiff further alleges that he was called "boy" on two occasions (Dkt. # 18-2, at 82) and that officers would provide things to "whites" that officers would not provide for plaintiff.  Dkt. # 36-13, at 5.  However, even though "[t]his conduct, if true, is deplorable and unprofessional," it does not rise to the level of a constitutional violation.  Williams v. Levansailor, 153 F.3d 730, *1 (10th Cir. 1998) (collecting cases finding verbal abuse alone is not actionable) (unpublished).[6]  Further, the Tenth Circuit has found that "[v]erbal harassment or abuse . . . is not sufficient to state a constitutional deprivation under 42 U.S.C. s [sic] 1983."  Collins v. Cundy, 603 F.2d 825, 827 (10th Cir. 1979) (citations omitted).

---

[6]     Unpublished decisions are not precedential, but may be cited for their persuasive value.  See Fed. R. App. P. 32.1; 10th Cir. R. 32.1.

Finally, even when plaintiff's claims are viewed in combination, including the withholding of toilet paper, withholding of two meals, unholstering guns, use of racial epithets or slurs, and use of handcuffs, especially considering the necessarily short duration, plaintiff's claims do not rise to the level of a constitutional violation.  In sum, the Court finds that, viewing the facts in the light most favorable to plaintiff, there is no genuine dispute of material fact that the prison conditions suffered by plaintiff were "sufficiently serious" to constitute Eighth Amendment violations.

**2.**

In addition to failing to meet the "substantially serious" requirement, plaintiff's Eighth Amendment claims fail because there is no genuine dispute of material fact as to the second prong of the Farmer test.  The second, subjective prong requires that prison officials show "deliberate indifference" to the existence of any risk inherent in exposure to the challenged conditions.  The Supreme Court explained,

> [A] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

Farmer, 511 U.S. at 837.  Under the second prong, "it is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm." Id. at 842.  Whether an official has the requisite knowledge and ignored the substantial risk to plaintiff is a question of fact.  Id. "Because it is difficult, if not impossible, to prove another person's actual state of mind, whether an official had knowledge may be inferred from circumstantial evidence." DeSpain, 264 F.3d at 975.  Though it is not enough to establish that an official should have known of the risk of harm, "a

22

factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." Farmer, 511 U.S. at 842.

Here, the risk of substantial harm to plaintiff was not obvious. Plaintiff was provided regular meals, at least twice daily. His toilet paper access was restricted, but toilet paper was provided and some of it may have been used to stuff a vent. He was provided a cover when he was cold. Finally guns were unholstered only when plaintiff's cell door was open or officers were entering his cell. The Court finds that the summary judgment record is completely devoid of any evidence - - direct or circumstantial - - to support defendant's knowledge that the officers were placing plaintiff in risk of substantial harm. Given that there is no genuine dispute of material fact with respect to either the first or second prongs, the Court finds that defendant is entitled to summary judgment on plaintiff's Eighth Amendment claims regarding his conditions of confinement.

**3.**

As discussed above, plaintiff claims that officers threatened him and unholstered their guns in his presence, which could be construed as claims that plaintiff was subjected to excessive use of force.   Whether force is excessive in violation of the Eighth Amendment depends upon the circumstances confronting the officer as well as the nature and amount of force applied in reaction. Whitley, 475 U.S. at 321. Also relevant is the extent of any injury. Hudson v. McMillian, 503 U.S. 1, 9-11 (1992). Minor injury does not preclude an action for excessive force, but "*de minimis* uses of physical force" ordinarily will not support a claim. Id. at 9-10.

Plaintiff alleges that officers "threatened" to harm him.  In plaintiff's response to defendant's interrogatories, plaintiff states that he

> [c]annot sleep at night a lot of the time; I think they are going to break in my house, because there was a cop who threatened me while I was in handcuffs saying, 'Do you

23

> know what I can do to you?'  They can do what they want.  They are officers so yes,
> I am under a lot of stress and depression; also with the job loss.

Dkt. # 36-13, at 4.  Plaintiff also asserts that officers threatened him, while they had a gun

unholstered, by stating the officer would "make sure you get it" when plaintiff was cleaning up milk

that he had spilled outside of his cell door.  Dkt. # 36-13, at 3.  These allegations do not rise to the

level of a constitutional violation. See McBride, 240 F.3d at 1291 n.3 ("[A]cts or omissions resulting

in an inmate being subjected to nothing more than threats and verbal taunts do not violate the Eighth

Amendment."); Collins, 603 F.2d at 827 (holding that a sheriff's threats to hang a prisoner were

insufficient to state constitutional deprivation under § 1983); see also Hulsey v. Texas, 929 F.2d

168, 172 (5th Cir. 1991) (stating mere threat insufficient to demonstrate significant injury needed

to sustain excessive force claim).  Further, plaintiff alleges that officers handcuffed him tightly and

that the handcuffs left marks on his wrist.  Dkt. # 18-2, at 93; Dkt. # 36-20.  Although a minor injury

does not necessarily lead to the conclusion that plaintiff's claim must fail, de minimis use of physical

force, such as handcuffing an inmate while the inmate is in a holding cell, cannot support a claim

of excessive force.  Hudson, 503 U.S. at 9-11.

Plaintiff's allegation of excessive force is at best de minimis and does not rise to the level

of a constitutional violation.  Hudson, 503 U.S. at 9-10.  It is well settled that, in an action for

damages, a municipality cannot be liable when none of its officers committed a constitutional

violation.  See Heller, 475 U.S. at 799.  Because the City of Bixby officers did not commit any

constitutional violations, plaintiff's § 1983 claims against defendant based upon Eighth Amendment

violations cannot survive summary judgment.

**4.**

Even assuming, <u>arguendo</u>, that plaintiff had established a constitutional violation, plaintiff has failed to show a sufficient basis for municipal liability on any of his Eighth Amendment claims. Defendant is only liable if plaintiff shows both (1) that a right secured by the Constitution or laws of the United States was violated and (2) that the alleged violation was committed by a person acting under color of state law.  <u>West</u>, 487 U.S. at 48 (citations omitted).  Section 1983 "will not support a claim based on a *respondeat superior* theory of liability."  <u>Polk Cnty.</u>, 454 U.S. at 325.  In the case of a municipal entity, the "under color of state law" element requires that the constitutional deprivation occurred pursuant to official policy or custom, so that a municipal entity may be held liable for an act it has officially sanctioned, or for the actions of an official with final policymaking authority.  <u>Pembaur</u>, 475 U.S. at 480, 482-83.  A plaintiff "must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights."  <u>Barney</u>, 143 F.3d at 1307 (quotation omitted).

Plaintiff has failed to show that defendant had an official policy restricting toilet paper, restricting food, lowering cell temperatures, unholstering guns in an inmate's presence, or regarding use of racial slurs and epithets.  In fact, plaintiff acknowledges that there is no policy allowing for restriction of meals, withholding food, using racial slurs, or withholding toilet paper.  Dkt. # 36, at 6-7.  Plaintiff has also failed to show that defendant had a custom or practice of depriving plaintiff and other similarly situated individuals of any of the above-mentioned items or of unholstering guns in an inmate's presence.

Further, plaintiff has not alleged that any of the officers in the Bixby lock-up facility are officials with final policymaking authority. Earl Shirley, the Chief of the Police of Bixby, Oklahoma, stated that he did not "have anything to do with the arrest or incarceration" of plaintiff and that he was not involved with plaintiff's incarceration or arrest; Officer Shirley did not even know plaintiff was an inmate in the City of Bixby lock-up facility in October 2011. Dkt. # 36-2, at 4. Corporal White supervises the field officers and is the jail administrator. Dkt. # 36-6, at 3. Corporal White was involved in at least two of the incidences described in plaintiff's complaint, and Corporal White was the individual who issued the citation to plaintiff for destroying, injuring, or molesting public property. Id. at 11-15. Corporal White's described his duties as jail administrator as:

> the operation of the jail as far as . . . everyday operations . . . . [M]ake sure we have our food and everything that's needed for that . . . periodic inspections, you know, like fire extinguishers, first-aid kits, make sure the door is shut and locked and adequate lighting. I make sure there's no tears or rips in our bedding, make sure our smoke detectors are in good shape and they work; they haven't been tampered with, no writing on the walls, things like that.

Id. at 3. Corporal White stated that the chief of police, however, is responsible for maintaining and implementing the policies and procedures of the jail. Id. at 8.

Plaintiff failed to identify specific officers involved in each of plaintiff's claims. Instead, plaintiff argues that defendant should be liable based on a failure to train. In other words, plaintiff claims that, because defendant failed to provide policies to its officers regarding the use of racial epithets, withholding toilet paper, turning off the water while an inmate is in the shower, tightening handcuffs, or withholding food, defendant should be held liable for the officers' actions. Further, plaintiff alleges that defendant ratified the conduct of its employees because, in responding to

plaintiff's complaint, defendant contended that plaintiff "was treated reasonably and appropriately at all times of his incarceration."  Dkt. # 36, at 21.

Although a municipality may be held liable for its failure to train employees, <u>Harris</u>, 489 U.S. at 380-81, liability attaches "[o]nly where a municipality's failure to train . . . evidences a 'deliberate indifference' to the rights of its inhabitants."  <u>Id.</u> at 389.  In other words, "the need for more or different training [must be] so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need."  <u>Id.</u> at 390.  Without providing any citation, plaintiff argues that there are "numerous" cases regarding "prison confinement conditions," which must lead to the conclusion that the situations at issue in plaintiff's case are "usually recurring situations." Dkt. # 36, at 21.  However, simply because the federal court system has had "numerous" cases regarding "prison confinement conditions," that does not lead to the conclusion that a lock-up facility must have policies regarding the use of racial epithets, withholding toilet paper, or plaintiff's other claims.

Finally, plaintiff's argument that defendant ratified the actions of the officers evidences a misunderstanding of municipal liability.  Plaintiff argues that defendant ratified its officers' treatment of plaintiff when it stated that defendant "contends that the Plaintiff . . . was treated reasonably and appropriately at all times of his incarceration."  Dkt. # 36, at 21; Dkt. # 36-11, at 2. While plaintiff does not cite to a source for defendant's alleged ratification, the Court presumes that plaintiff intended to quote defendant's version of the facts provided in the proposed pretrial order. Dkt. # 36-11, at 2.  However, while plaintiff is correct that "ratification" may subject a municipality to liability, ratification through claims made in litigation, including language in a proposed pretrial

order, is not ratification of employees' actions sufficient to subject a municipality to liability.  See

Praprotnik, 485 U.S. at 127.   "[W]hen a subordinate's decision is subject to review by the

municipality's authorized policymakers, they have retained the authority to measure the official's

conduct for conformance with *their* policies."  Id. (emphasis in original).   Therefore, "[i]f the

authorized policymakers approve a subordinate's decisions and the basis for it, their ratification

would be chargeable to the municipality because their decision is final."  Id.  Thus, ratification by

policymakers is sufficient to subject a municipality to liability pursuant to § 1983; however,

statements made, presumably by counsel for defendant, after the close of discovery regarding

defenses or claims does not constitute ratification of an employee's actions, including the actions

of the officers within the Bixby lock-up facility.  Therefore, plaintiff's claims fail as a matter of law,

and summary judgment should be granted as to plaintiff's Eighth Amendment claims.

### C.

Plaintiff's third claim is that his rights under the Fourteenth Amendment were violated

because the arresting officer stopped his vehicle based solely on plaintiff's race.  "[T]he Constitution

prohibits selective enforcement of the law based on considerations such as race.   But the

constitutional basis for objecting to intentionally discriminatory application of the laws is the Equal

Protection Clause, not the Fourth Amendment."  Whren v. United States, 517 U.S. 806, 813 (1996).

An officer's reasonable belief that probable cause exists for a traffic stop does not affect the

availability of a separate selective enforcement claim under the Equal Protection Clause.  Marshall

v. Columbia Lea Regional Hosp., 345 F.3d 1157, 1166 (10th Cir. 2003).  This claim does not require

proof that plaintiff was stopped without probable cause or reasonable suspicion to believe he

committed a traffic violation or other crime.  But, he must prove that the arresting officer exercised

his discretion to enforce the law on account of race, which requires proof of both discriminatory effect and discriminatory purpose. United States v. Armstrong, 517 U.S. 456, 465 (1996). When the claim is selective enforcement of the traffic laws or a racially-motivated arrest, the plaintiff must normally prove that similarly situated individuals were not stopped or arrested, in order to show the requisite discriminatory effect and purpose. See Chavez v. Ill. State Police, 251 F.3d 612, 634-48 (7th Cir. 2001); Gardenhire v. Schubert, 205 F.3d 303, 319 (6th Cir. 2000); United States v. Bell, 86 F.3d 820, 823 (8th Cir. 1996) ("To establish discriminatory effect in a race case, the claimant must show people of another race violated the law and the law was not enforced against them."). Discriminatory effect may by proved with specific evidence of similarly situated non-minority motorists who were not stopped for the traffic violation, or with statistical or other evidence which generally proves that members of a protected racial group receive less favorable treatment than nonmembers. Chavez, 251 F.3d at 636; Farm Labor Organizing Comm. v. Ohio State Highway Patrol, 308 F.3d 523, 534 (6th Cir. 2002); United States v. Barlow, 310 F.3d 1007, 1010 (7th Cir. 2002).

To show discriminatory purpose, a plaintiff must prove that the officer's decision to stop his vehicle was at least partially based on race. Bell, 86 F.3d at 823 (citing United States v. Brown, 9 F.3d 1374, 1376 (8th Cir. 1993)). Discriminatory purpose "implies more than . . . intent as awareness of consequences. It implies that the decision maker . . . selected or reaffirmed a particular course of action at least in part because of, not merely in spite of, its adverse effects upon an identifiable group." Brown, 9 F.3d at 1376 (quoting Wayte v. United States, 470 U.S. 598, 610 (1985) (alterations in Brown)). A defendant alleging selective law enforcement based on race need not prove the officer lacked any race-neutral reason for conducting the traffic stop. Farm Labor

Org. Comm., 308 F.3d at 538. "[A]n invidious discriminatory purpose may often be inferred from the totality of the relevant facts, including the fact, if it is true, that the [practice] bears more heavily on one race than another." Washington v. Davis, 426 U.S. 229, 242 (1976).  A litigant alleging racial profiling must produce "some evidence" of both discriminatory effect and discriminatory intent. United States v. Alcaraz-Arellano, 441 F.3d 1252, 1264 (10th Cir. 2006) (applying standard announced in Armstrong, 517 U.S. at 470, to claim of selective law enforcement).

If the plaintiff makes a prima facie showing of both discriminatory effect and purpose, the "burden shifts to the [officer] to show the same enforcement decision would have been made even if the discriminatory purpose had not been considered." Bell, 86 F.3d at 823 (citing Sylvia Dev. Corp. v. Calvert Cnty., 48 F.3d 810, 819 n. 2 (4th Cir. 1995)). While a prima facie equal protection claim may be proved by direct evidence of racial discrimination, Johnson v. Crooks, 326 F.3d 995, 1000 (8th Cir. 2003), it is more commonly based on circumstantial evidence. Kim v. Nash Finch Co., 123 F.3d 1046, 1059 (8th Cir. 1997) ("there will seldom be 'eyewitness' testimony as to the [racially discriminatory] mental processes"). An officer's discriminatory selective law enforcement may be inferred from evidence of the officer's pattern and method of performing traffic stops and arrests; relevant departmental policies and training governing the officer's conduct; failure to uniformly comply with the relevant training and supervisory instruction received; the questions presented and statements made by the officer to vehicle occupants; the specific events of the traffic stop at issue; and any other relevant information which may support an inference of discriminatory purpose in this context.  Marshall, 345 F.3d at 1168; United States v. Woods, 213 F.3d 1021, 1022-23 (8th Cir. 2000) (discussing Minnesota's policy and task force report on racial profiling).

30

In this case, Plaintiff's bald assertion that he was the subject of racial profiling is without support. Plaintiff asserts that is "how it goes in Bixby," and that he has heard "rumors" about racial profiling. Dkt. # 36-1, at 13-14. Plaintiff further asserts that the "subsequent treatment of Plaintiff by Defendant supports the racial animus here: the racial epithets, the retaliatory charge[ ] when plaintiff was let out of jail, and the malicious and sadistic treatment of Plaintiff in jail . . ." Dkt. # 36, at 23. The question is limited to whether plaintiff has submitted evidence that the arresting officer stopped him, rather than other similarly situated non-African American individuals, because of his race. Plaintiff has offered no evidence that the arresting officer does not stop non-African Americans under similar circumstances. Instead, plaintiff makes only conclusory statements of personal opinion that he was stopped because of his race. Further, plaintiff acknowledges that he has been arrested and incarcerated previously, in other cities, for the same offense. Dkt. # 36-1, at 9. Nothing in the record suggests that the arresting officer demonstrated racial animus. Instead, plaintiff acknowledges that the arresting officer treated him professionally and appropriately. Id. at 15. As the non-moving party, plaintiff must "identify affirmative evidence from which a jury could find that the plaintiff has carried his or her burden of proving the pertinent motive." Crawford-El v. Britton, 523 U.S. 574, 600 (1998). He has failed to do so. Therefore, summary judgment is appropriate on plaintiff's claim under the Fourteenth Amendment that the arresting officer arrested plaintiff based on plaintiff's race.

**D.**

Plaintiff's fourth claim for relief is that his charge and conviction for destroying, injuring, or molesting public property was a retaliatory charge based on his race. Plaintiff does not further clarify the basis for his claim. To the extent plaintiff is claiming, pursuant to § 1983, that his

31

conviction is invalid, that claim is subject to the Heck analysis. See supra IV.A. As previously

noted, pursuant to Heck, 512 U.S. at 487, "a state prisoner's claim for damages is not cognizable

under 42 U.S.C. § 1983 if 'a judgment in favor of the plaintiff would necessarily imply the invalidity

of his conviction or sentence,' unless the prisoner can demonstrate that the conviction or sentence

has previously been invalidated." Edwards, 520 U.S. at 643 (quoting Heck, 512 U.S. at 487).

Plaintiff's direct appeal of his conviction is presently pending. Because an award of damages would

necessarily imply the invalidity of plaintiff's conviction for destroying, injuring, or molesting public

property charge, plaintiff's claim is subject to the Heck analysis, and plaintiff's claim of retaliatory

charge challenging his conviction for destroying, injuring, or molesting public property should

therefore be dismissed without prejudice.

### E.

Plaintiff's remaining claims are for violations of the Oklahoma Constitution or based upon

Oklahoma law. This case was removed on the basis of federal question jurisdiction, but the Court

has found that plaintiff's federal claims are subject to dismissal or summary judgment. Under 28

U.S.C. § 1367(c), a federal district court may decline supplemental jurisdiction when it has

adjudicated "all claims over which it has original jurisdiction." Koch v. City of Del City, 660 F.3d

1228, 1248 (10th Cir. 2011) (district court did not err in declining to exercise supplemental

jurisdiction after granting summary judgment on all plaintiff's federal law claims, leaving only state

law claims). The remaining claims are for the torts of outrage and assault and battery as well as

violations of the Oklahoma constitution. Questions of Oklahoma law should be resolved by an

Oklahoma court. See United Mine Workers of America v. Gibbs, 383 U.S. 715, 726 (1966)

("Needless decisions of state law should be avoided both as a matter of comity and to promote

justice between the parties . . .").  The Court declines to exercise supplemental jurisdiction under § 1367(c), and plaintiff's state law claims should be remanded.

### F.

Plaintiff also states in his response to defendant's motion for summary judgment that, if the municipal judge is found to be immune from suit, injunctive relief is requested.  The Tenth Circuit has found that, where a § 1983 plaintiff did not specifically request injunctive relief; the allegations in the complaint provided no indication injunctive relief would ameliorate the alleged violations; and the damages requested were monetary, injunctive relief was inappropriate.  Calderon v. Kansas Dept. of Soc. and Rehab. Servs., 181 F.3d 1180, 1183-84 (10th Cir. 1999).  The Tenth Circuit further found injunctive relief, though not barred by Heck, was inappropriate where plaintiffs "offered no evidence that they risk facing the allegedly unconstitutional sentencing procedures in the future." Lawrence v. McCall, 238 Fed. Appx. 393, 396 (10th Cir. 2007) (citing City of Los Angeles v. Lyons, 461 U.S. 95, 105-06 (1983)) (unpublished).[7]  Plaintiff did not request injunctive relief in his petition.  Further, plaintiff does not specify the type of injunctive relief that he seeks, and plaintiff has offered no evidence that he would be subject to any deprivation of rights in the future.  Dkt. # 36, at 18.  Plaintiff named only the City of Bixby as a defendant in this action, and not the municipal judge.  Dkt. # 2-1, at 1.  Therefore, whether the municipal judge is immune from suit has no bearing on plaintiff's possible relief.  Because plaintiff has failed to show that he is likely to suffer another constitutional violation, injunctive relief is not appropriate.

---

[7]      Unpublished decisions are not precedential, but may be cited for their persuasive value.  See Fed. R. App. P. 32.1; 10th Cir. R. 32.1.

**IT IS THEREFORE ORDERED** that defendant's motion for summary judgment (Dkt. # 18) is **granted in part** as to plaintiff's claims pursuant to 42 U.S.C. §§ 1981 and 1983 for violations of the Eighth and Fourteenth Amendments.  However, plaintiff's claims, pursuant to either 42 U.S.C. § 1981 or § 1983, for violations of the Sixth Amendment and for retaliatory charge are **dismissed without prejudice** pursuant to <u>Heck</u>.

**IT IS FURTHER ORDERED** that the Court Clerk is directed to **remand** plaintiff's state law claims to the District Court of Tulsa County, Oklahoma.

**IT IS FURTHER ORDERED** that all other pending motions are **deemed moot**.

**IT IS FURTHER ORDERED** that the pretrial conference set for December 13, 2012 and the trial set for December 17, 2012 are **stricken**.

**DATED** this 10th day of December, 2012.

CLAIRE V. EAGAN
UNITED STATES DISTRICT JUDGE

34